Fort Worth & Denver City Railway Company v. A. M. Ramp.

Decided November 22, 1902.

**Master and Servant—Assumed Risk—Defective Tools.**

Where a railroad employe was furnished with a chisel, to be used by him in cutting steel rails, and he knew the chisel was defective, and also knew the danger of using it in its defective condition, and was injured by reason of a particle flying from the chisel and striking him in the eye, the risk was one which he assumed, regardless of the care he otherwise exercised. Evidence held to authorize, as a matter of law, and over the verdict of a jury, that the risk was assumed.

Appeal from the District Court of Donley County. Tried below before Hon. H. H. Wallace.

*Stanley, Spoonts & Thompson* and *J. H. Barwise, Jr.,* for appellant.

*Ware & Smith,* for appellee.

CONNER, Chief Justice.—Appellee was awarded $5000 by the verdict and judgment below as damages for injury to his eyes, caused by a particle of steel flying from a chisel with which he was working in cutting a steel rail required in the repair of one of appellant's turntables at Clarendon, Texas. Appellee alleged that he was a member of one of appellant's bridge gangs, and while so employed was, with others, directed to make the repairs indicated which was, as to him, extra hazardous, and of which he had no knowledge and was unwarned, and that the chisel in question was defective in that it was "cracked and shivered," by reason of which one eye was destroyed and the other injured.

The defense, among other things, was that if the chisel was defective, which was denied, that the defect was obvious and the danger known to appellee, and that the risk involved was one of those assumed by him in his employment. This we find to be the only material question necessary for our determination, appellant's contention being that the undisputed evidence established such defense, and that the court should therefore have given its requested peremptory instruction to the jury to find for appellant.

There seems but little, if any, substantial conflict in the evidence, but four witnesses testifying, whose rendition of the circumstances appear before us in an agreed statement of facts. Appellee testified in his own behalf: "My name is A. M. Ramp; * * * was employed in the bridge building department of the Fort Worth & Denver. I remember the occasion of their roundhouse burning at Clarendon, which occurred July 5, 1901. * * * The morning after the fire I was put to work cleaning up the debris. The first thing we did was to remove the old deck from the turntable. Mr. Bell was supervising the work. Mr. Morris was foreman under Mr. Bell and acting in his ab-

sence.  After removing the deck from the turntable we went to work to put a new foundation under the stationary engine.  We laid wooden stringers 8x16 on each, and then had to cut rails a certain length for the engine to sit on.  These rails had to be cut and we went out to the main track so we could put the rails to be cut across the track.  Mr. Morris sent to Mr. Freeman, who had another gang working there, to see if I could secure a track chisel to cut rails with.  Mr. Freeman sent a man with me to his car and I got a chisel.  I handed the chisel to Mr. Morris and he held it to cut the first rail, and I think I struck for him.  We then changed about holding the chisel and striking.  The first time I held the chisel nothing occurred.  When it came to me again I noticed that it had begun to look a little battered.  I held myself away from the chisel as far as I could, but before the rail was half in two a piece flew off and hit me in the eye.  In about a half a minute my eye went out.

"I belonged to the bridge gang, but was inexperienced in this work and had never held a chisel before.  When I got hold of the chisel the last time I noticed that it was pretty badly battered, and I kept as far away from it as I could reach with the handle in the hammer or chisel.  A man by the name of Nichols was striking when I got hurt.  I was not familiar with this kind of work and no one warned me to be careful, or that the work was dangerous.  I handled the chisel as carefully as I knew how.  So far as I know none of the employes of the company came around to inspect the hammers and chisels while the work was going on.  I know from experience that a chisel in a battered, shattered, and shivered condition is not as safe as one that is not so battered.  Nor is it as liable to throw off particles of steel.  *  *  *  The accident happened July 8, 1901, between 5 and 6 o'clock.  *  *  *  I became a member of the bridge gang in March, 1901.  The first railroading I ever did was with the Fort Scott & Kansas for about a month and a half.  I was working as a section hand.  I did not cut any rails for this road.  I saw some cut.  Little pieces always fly when they are cut.  I do not know where the chip came from that hit me.  I do not know what became of the piece that hit me.  I never saw it.  I made out a written report of the accident, and stated that it was an accident and that no one was to blame for it.

"There were about six men in my gang and Mr. Morris was a member of the gang and did the character of work that we did.  Mr. Bell superintended the work in the yards and gave us our orders.  When I got the chisel from Mr. Freeman I did not notice it at all.  I did not hold it up and look at it, but just carried it to Mr. Morris.  It was just an ordinary chisel, about eight inches long and a little swelled at the end where the handle went in.  I do not remember my exact position when the steel hit me in the eye, but I think I was squatting down.  I had on a white Stetson hat.  While I was holding the chisel on this same rail there was a man named McCrady who had a piece of steel hit him in the eye, just a little before I was hurt.  I knew a few minutes

before I was hurt that pieces were flying. The chisel was battered some the first time I held it to the rail. The first time I noticed that the one I was holding was badly battered was when the other man got hit. The chisel was in plain view of me all the time I was holding it; I just had not noticed that it was battered. When the other man got hit was the first time I knew that a battered chisel was more dangerous than a new one. He was standing opposite where they were cutting, not doing anything, but standing there. All I know about the condition of the chisel I learned between the time the other man got hurt and when I got hurt, just a minute or two. We had been cutting rails with the chisel from the time I got it until I was hurt. I suppose we had cut five or six rails with it. After the other men got hurt I knew that there was danger of getting hurt from flying steel. I kept on working with the chisel. I would have got my time if I had refused to go on with the work. I do not know that chips are always flying when rails are being cut. If the chisel wabbled to one side or the other, I think it would be likely to cause chips to fly. I do not know where the chip came from that struck the other man. He was standing eight or nine feet from where they were cutting the rail. When he got the sliver in his eye we stopped and removed it."

N. H. Nichols testified: "I was present on the occasion of Mr. Ramp getting his eye put out. I was striking at the time. I can not tell when a chisel is battered. I do not know whether the chisel Mr. Ramp was using was battered or not. * * * It would have taken an experienced hand to tell whether the chisel was dangerous or not. An ordinary hand could not do so."

W. A. Morris testified: "I am a bridge hand in the employ of the Fort Worth & Denver, and have been working for said company three years. I have also worked in bridge gangs before I came to work for the Denver. My experience is that bridge men have a little of everything to do, fix bridges, cut rails, etc. Under different circumstances a bridge man may have to cut rails every day for a month or so. In fact it is one of the ordinary duties of a bridge man to cut rails. In repairing the damage done by the fire at Clarendon an occasion arose requiring some rails to be cut. I sent Mr. Ramp to Mr. Freeman's car for the chisel, which he got. I examined the chisel and found that it was battered very little, having had but slight use. The chisel was above the average condition. After this accident we continued to use the same chisel. In cutting rails this way a man must expect slivers to fly all the time in all directions. In moving the chisel across the rail, there will be times when it is not put in exactly the same place as the former cut, and this will chip off a little piece of steel, which is likely to fly in any direction. The chisel was not at all dangerous in the condition in which it was. I cut the first rail myself. It does not require any inspection to tell if a chisel is battered; a man can tell that by simply glancing at it. I did not tell Mr. Ramp that the work he was doing

was dangerous or that chips would fly. Chips were flying around there before he got hurt and he could see that they were flying. Chips from the rail would fly parallel with the rail."

S. McCleary testified: "I am superintendent of bridges and building for the Fort Worth & Denver and have been engaged in bridge work since 1879. A bridge man is an all-round man. There is nothing comes up on the road that he is not expected to do,—building bridges, cutting rails for washouts and elsewhere, etc. There are numerous occasions where a bridge man is called upon to assist in cutting rails. I have had a great deal of experience in cutting rails. Chips are always liable to fly when rails are cut with a chisel. A chisel that has been used a little and is battered down some is less liable to throw off slivers than a right new chisel, for some of the temper has been taken out of it, and it will batter off and not chip off. A man can protect his eyes, either with his hand or by turning his head away, or by pulling his hat down over his eyes."

Pretermitting all other questions suggested by the foregoing testimony, we think it evident therefrom that appellee assumed the risk of the accident resulting in his injury. By his own delineation of the circumstances he saw and knew of the defect, if defect there was, in the implement complained of. He not only knew this, but also knew of the danger, a forceful illustration of which occurred in his presence and within his knowledge immediately prior to his own injury. Longer time or other warning was not needed to apprehend the very danger from which appellee suffered. Under such circumstances, however much we may deplore his injury, and regardless of the degree of care appellee otherwise exercised, the law undoubtedly requires of us the conclusion that he showed no right of recovery. See Railway v. Gray, 25 Texas Civ. App., 99, 2 Texas Ct. Rep., 742; Railway v. Bingle, 9 Texas Civ. App., 322, 29 S. W. Rep., 675; Railway v. Bradford, 66 Texas, 732; Railway v. Drew, 59 Texas, 11; Railway v. Hanig, 91 Texas, 350; Railway v. Wood, 35 S. W. Rep., 880.

It follows that the peremptory instruction should have been given, and that the judgment should be reversed and judgment here rendered in appellant's favor, and it is so ordered.

*Reversed and rendered.*